**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CARTER BRETT | No. 20-CR-80<br><br>Judge Thomas M. Durkin |

**GOVERNMENT'S SENTENCING MEMORANDUM AND**
**MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G. § 5K1.1**

Over the course of four years, Defendant Carter Brett abused his position as a salesman for a major flooring products manufacturer to operate two distinct criminal schemes for his own financial benefit. First, Brett recruited three commercial flooring installation companies to rig bids for projects at a local community college, forming a conspiracy that successfully rigged at least fifteen bids for projects worth $600,000 in total. Because the flooring installers knew who would win each project in advance, they had no reason to push Brett for lower quotes on flooring products, allowing Brett to charge higher prices and thereby earn higher commissions. Second, Brett solicited at least $111,000 in kickback payments in exchange for improper discounts on his employer's flooring products, which he then laundered through a shell company.

Brett's bid-rigging and money-laundering schemes were flagrant and inexcusable, warranting a custodial sentence. At the same time, Brett has not only accepted responsibility and pleaded guilty to these crimes, but has also provided substantial assistance to the government's investigation into bid rigging and money

laundering in the Chicago commercial flooring industry, warranting a downward departure under U.S.S.G. § 5K1.1. To properly balance the severity of Brett's crimes and the value of the assistance he has provided, the government respectfully requests that the Court impose a below-Guidelines sentence of sixteen months of imprisonment and a $10,000 fine.

## I. OFFENSE BACKGROUND

The government provided a detailed overview of the defendant's conduct in the Government's Version of the Offense, which is attached to the Presentence Investigation Report ("PSR"). The brief summary below is drawn from the Government's Version of the Offense, the PSR, and the factual basis in Brett's plea agreement.

Brett was an Account Executive for Manufacturer A, a major manufacturer of flooring products. At Manufacturer A, account executives are effectively salesmen, responsible both for promoting the use of Manufacturer A's products by building relationships with end users, general contractors, and commercial flooring installers, and for negotiating and processing specific orders for flooring products. When negotiating prices for specific orders, account executives at Manufacturer A are bound by a pricing matrix issued by the company, which provides a range of authorized prices for every product. Account executives were incentivized to quote prices higher in the range of authorized prices because their sales commissions were tied to the overall value of the sale.

The conduct at issue here primarily involves Brett's relationships with several commercial flooring installation companies.[1] Flooring installation companies generally obtain business through competitive bidding. In the competitive-bidding process, the flooring installation company submits a bid to a general contractor or construction manager, who, in turn, bids to the owner or end user of the site for many construction subtrades. Some projects do not require the services of a general contractor, however, so end users may solicit competitive bids directly from the flooring installation companies.

In most cases, the end user or general contractor will specify a particular flooring product to be used for the project. Consequently, all of the flooring installers preparing bids for the project will need to request cost estimates from the same manufacturer, and will typically need to work with same account executive. Thus, the manufacturer's account executive is often in the unique position of knowing the identity of all the potential bidders for the flooring subcontract in advance of the submission of the bids to the general contractor or end user. Further, assuming all else is equal, the manufacturer's account executive can effectively determine the winner of the flooring subcontract by offering a given company an "edge"—that is, a lower quote for the specified material than the quotes offered to every other potential bidder.

---

[1] These companies provide flooring services and products in commercial (i.e., non-residential) spaces. Their services typically include removing preexisting flooring products at the job site, preparing the floor surface for installation, and installing new flooring materials, such as carpet, wood, vinyl, and tile.

Brett began rigging bids in 2013, when he noticed that only three companies—Mr. David's Flooring International, LLC ("Mr. David's"),[2] Company B, and Company E—were routinely bidding on flooring projects at Victim 12, a community college in Palos Hills, Illinois. Brett reached out to each company to propose a bid-rigging scheme, whereby the winning bidder for projects awarded by Victim 12 would be evenly divided among Mr. David's, Company B, and Company E by rotating the winning bidder. The arrangement was mutually advantageous: the flooring installers no longer had to expend resources competing for projects and could charge higher prices without fear of being undercut; because they no longer had to compete on price, they had no reason to negotiate lower quotes from Brett, or to push for materials from a different manufacturer to be specified.

Initially, the conspiracy was limited to projects for which Victim 12 had specified one of Manufacturer A's products. For these projects, Brett would offer an "edge" on pricing for the product to the conspirator that had been designated to win, allowing that company to submit a lower-priced bid to Victim 12. Brett directed the other two companies to submit higher-priced, intentionally-losing bids—known as complementary or "comp" bids—thereby maintain the façade of competition and keeping Victim 12 in the dark as to the existence of the bid rotation scheme. Brett did not rotate the winning bid amongst the conspirators in a strict sequence, further disguising the bid rotation scheme from Victim 12.

---

[2] Identified as "Company A" in the plea agreement.

Eventually, Mr. David's, Company B, and Company E ceased relying on Brett to coordinate the bid-rotation scheme, expanding the scheme to jobs that did not involve Manufacturer A's products. The conspiracy finally ended in 2017 after the FBI executed a search warrant on Mr. David's offices and began overtly investigating bid rigging in the Chicago commercial flooring industry. By that point, the conspirators had successfully rigged at least fifteen bids for projects at Victim 12 worth $600,000 in total.

In addition to orchestrating the bid-rotation scheme, Brett also directed a separate money-laundering conspiracy. By 2013, Brett had begun providing "edges" to various flooring installation companies in exchange for kickbacks. However, in early-to-mid 2013, Coconspirator A3 proposed that Brett establish his own shell company to receive kickback payments from Mr. David's for the purpose of concealing the kickbacks from law enforcement and from Manufacturer A.

Brett directed his accountant to establish a company called "MGAB13 Consulting, Inc.," with one of Brett's family members listed as the nominal owner. Brett then directed his family member to establish a bank account in MGAB13's name. On August 9, 2013, his family member filed the necessary paper work to establish a bank account for MGAB13 with Roselle Bank & Trust in Roselle, Illinois.

With the bank account set up, Brett proceeded to launder numerous kickbacks through MGAB13 over the following four years. Besides Mr. David's, three other flooring companies also conspired with Brett to launder kickbacks through MGAB13. When a representative from one of the coconspirator companies would call Brett for

a quote on a flooring product for an upcoming project, Brett would offer the representative an "edge" on the quote in exchange for a kickback. If the representative agreed, Brett would direct that representative or another coconspirator at the flooring company to pay the kickback in the form of a check to MGAB13. Brett's family member would deposit these checks in MGAB13's bank account and then use the kickback proceeds to pay the family's credit card bills and other personal expenses.

By soliciting and receiving kickbacks in exchange for discounts on flooring products, Brett violated the fiduciary duty he owed to Manufacturer A as its employee. Brett knew his conduct was wrong because he completed an annual "Standards Questionnaire" for Manufacturer A which, among other things explained that employees owed a duty of loyalty to Manufacturer A, that they were prohibited from receiving any bribes or kickbacks, and that they were required to report any violation of the policy. Every year, Brett confirmed that he had read and understood the Standards Questionnaire and affirmatively (and falsely) represented that neither he nor any of his family members had received any cash or cash equivalents from any of Manufacturer A's customers.

During the course of the conspiracy, Brett laundered at least twenty-four kickbacks through MGAB13, totaling $111,837.81.

## II.  PROCEDURAL HISTORY

On February 5, 2020, Brett was charged by information with one count of conspiring to rig bids in violation of the Sherman Act, 15 U.S.C. § 1, and one count of

6

conspiring to launder money in violation of 18 U.S.C. § 1956(h). ECF 1. On March 5, 2020, Brett appeared before the Honorable Judge Gary Feinerman and entered a plea of guilty to the information pursuant to a written plea agreement. ECF 9.

### III. GUIDELINES CALCULATIONS

#### A. Offense Level Calculations

The government agrees with and has no objection to the criminal history calculation set forth in the Presentence Investigation Report ("PSR"). PSR ¶¶ 51–60. Moreover, the government agrees that the offense level for Count One, conspiracy to rig bids in violation of 15 U.S.C. § 1, is 16, and that the offense level for Count Two, conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), is 21.[3] PSR ¶¶ 28–40.

However, the government disagrees with the PSR's recommendation not to group Counts One and Two. PSR ¶¶ 41–45. Consistent with Paragraph 17(e) of the plea agreement, the parties have agreed to recommend that, pursuant to § 3D1.2, Counts One and Two group because they involve substantially the same harm. The

---

[3] Although the government and the PSR calculate the same total offense level for Count Two, the government reaches that offense level by a different route. The government and the PSR agree on the following: (1) pursuant to § 2S1.1(a)(1), the base offense level is determined by § 2B1.1; (2) pursuant to § 2B1.1(a)(2), the base offense level is 6; (3) because the value of the laundered funds was more than $95,000 but less than $150,000, the base offense level is increased by 8 levels pursuant to § 2B1.1(b)(1)(E); (4) pursuant to § 2S1.1(b)(2)(B), the offense level is increased by 2 levels because the defendant was convicted under 18 U.S.C. § 1956; and (5) pursuant to § 3B1.1(c), the offense level is increased by three levels because the defendant was a manager or supervisor of criminal activity that involved five or more participants. PSR ¶¶ 34–35, 38. Consistent with Paragraph 18 of the plea agreement, which binds the parties to the Guidelines calculations set forth therein, the government recommends applying a 2-level increase for sophisticated laundering under § 2S1.1(b)(3). By contrast, the PSR recommends applying a 2-level increase under § 2B1.1(b)(10)(C) because the defendant's underlying honest services wire fraud involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. PSR ¶¶ 34, 36. Either way, the total offense level for Count Two is 21.

parties make this recommendation in part because the offense levels for Counts One and Two are determined on the basis of the total amount of harm or loss. *See* U.S.S.G. § 3D1.2(d) (noting that offense covered by § 2R.1.1 (which applies to Count One) and § 2S1.1 (which applies to Count Two) are to be grouped together).

Pursuant to § 3D1.3(b), in the case of counts grouped together pursuant to § 3D1.2(d), the offense guideline that produced the highest offense level should be used when the counts involve offenses of the same general type to which different guidelines apply. As described above, the offense level for Count One is 16 under § 2R1.1, and the offense level for Count Two is 21 under § 2S1.1. Thus, pursuant to § 3D1.3(b), § 2S1.1 determines the offense level, which is 21.

The government agrees with the PSR's recommendation that, because Brett has timely accepted responsibility, his offense level should be reduced by 2 levels under § 3E1.1(a) and 1 level under 3E1.1(b). PSR ¶¶ 46–47.

Therefore, the defendant's total offense level is 18 and his criminal history category is I, resulting in an advisory Guidelines range of twenty-seven to thirty-three months of imprisonment.[4]

### B. Guidelines Fine Calculation

The government disagrees with the advisory Guidelines fine calculation in the PSR. *See* PSR ¶¶ 116–17. Because Counts One and Two group under § 3D1.2(d), and the Guideline for Count Two, § 2S1.1, determines the defendant's offense level under

---

[4] Because the PSR does not group Counts One and Two, it calculates the defendant's total offense level as 19, resulting in an advisory Guidelines range of thirty to thirty-seven years of imprisonment. PSR ¶¶ 41–45, 48, 106.

§ 3D1.3(b), the defendant's fine range is determined by § 5E1.2(c)(3).[5] Under § 5E1.2(c)(3), because the defendant's offense level is 18, his advisory Guidelines fine range is $10,000 to $100,000.

### IV. Downward Departure Under U.S.S.G. § 5K1.1

Brett substantially assisted the government's investigation into bid rigging and money laundering in the Chicago commercial flooring industry, justifying a downward departure from his advisory Guidelines range. Specifically, the government requests that the Court impose a sentence of sixteen months, which is sixty percent of the low end of Brett's advisory Guidelines range. Under U.S.S.G. § 5K1.1, upon motion from the government, the Court may reduce a defendant's offense level if the defendant "has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." When determining the "appropriate reduction," the Court may consider any relevant factor, including: (1) "the significance and usefulness of the defendant's assistance"; (2) "the truthfulness, completeness, and reliability of [the defendant's] information"; (3) "the extent and nature of the defendant's assistance"; and (4) "the timeliness of the defendant's assistance."

---

[5] Because the PSR does not group Counts One and Two, it instead applies the special fine provision for antitrust defendants at § 2R1.1(c)(1). PSR ¶117; see § 5E1.2(b) (explaining that, if "the guideline for the offense in Chapter Two provides a specific rule for imposing a fine, that rule takes precedence over subsection (c) of this section"). Under § 2R1.1(c)(1), the guideline fine range for an individual defendant "shall be from one to five percent of the volume of commerce, but not less than $20,000." Under § 2R1.1(b), the "volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation." Because Brett was rigging bids on behalf of his customers, rather than on behalf of himself or his employer, his volume of commerce is $0 under § 2R1.1(b). Accordingly, under the PSR's approach, Brett's advisory Guidelines fine would be $20,000.

9

Here, each of these factors supports a downward departure. First, Brett's assistance was immensely useful, as he was the first cooperator in the investigation to provide detailed information concerning the bid-rotation scheme at Victim 12 and the money-laundering scheme. Brett's assistance was particularly useful in building the government's case against Mr. David's, as Brett would have been a key trial witness regarding Mr. David's involvement in the bid-rotation scheme and its payment of kickbacks to Brett through MGAB13. Ultimately, Mr. David's pleaded guilty to one count of bid rigging and one count of money laundering. *See United States v. Mr. David's Flooring International, LLC*, No. 21-CR-517 (N.D. Ill.).

Second, the information Brett provided was truthful, complete, and reliable, as other witnesses and the documentary record corroborated his account. In particular, Brett maintained paper records of the kickback checks deposited into MGAB13's bank account, which he quickly turned over to the government, and which assisted the government's efforts to verify his information.

Third, Brett's cooperation was extensive. He was interviewed by the government on four occasions and was willing to testify against any of his coconspirators. Although the government never called Brett to testify, this result was largely because his co-conspirators elected to plead guilty, not due to any reluctance to testify or lack of cooperation on Brett's part.

Finally, Brett's assistance was timely, as he began cooperating with the government's investigation in February 2019, before any other target of the investigation had been charged. By coming in early, Brett greatly accelerated the

10

pace of the investigation, ensuring that the government was able to charge his coconspirators within the statute of limitations.

As described above, Brett provided substantial assistance to the government's investigation into bid rigging and money laundering in the Chicago commercial flooring industry. Accordingly, the Court should grant the government's motion for a downward departure under § 5K1.1 and sentence Brett to sixteen months of imprisonment, which is sixty percent of the low end of his advisory Guidelines range.

### V.   Recommended Sentence

The government respectfully submits that a sentence of sixteen months of imprisonment and a fine of $10,000 is sufficient, but not greater than necessary, to comply with the principles set forth in 18 U.S.C. § 3553(a). Here, the most relevant of the § 3553(a) factors are: (1) the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment"; (2) the need "to afford adequate deterrence"; (3) "the history and characteristics of the defendant." The court should also consider Brett's cooperation with the government's investigation.

### A. The government's recommended custodial sentence reflects the seriousness of Brett's brazen bid rigging and money laundering.

Brett repeatedly abused his position to his own benefit. First, Brett's bid-rigging conspiracy cheated a public community college out of the competitive bidding process at least fifteen times. Because the conspirators knew who would win each project before submitting their bids, they had free reign to inflate their prices at the ultimate expense of local taxpayers. *See* U.S.S.G. § 2R1.1, background (explaining that "there is near universal agreement that restrictive agreements among

competitors, such as horizontal price-fixing (including bid-rigging) and horizontal market-allocation, can cause serious economic harm"). And because the flooring companies could inflate their prices, Brett could in turn inflate his quotes on the necessary flooring productions, cheating his way to higher commissions.

Second, Brett directly pocketed nearly $112,000 by laundering at least twenty-four kickback payments he received in exchange for discounts on his employer's flooring products. This scheme cheated Brett's employer both of his honest services and over one hundred thousand dollars in revenue. Moreover, in running this scheme, Brett dragged one of his family members into his criminal activity, as he made them the nominal owner of MGAB13 and had them deposit the kickback checks.

Brett's crimes were not isolated incidents. Rather, Brett systemically exploited weaknesses he perceived in Victim 12's bidding process and his employer's oversight. Both the bid-rigging conspiracy and the money-laundering lasted for years, and both ended only when the conspirators learned of the government's investigation. Throughout the duration of these conspiracies, Brett understood that his conduct was wrongful, yet he nevertheless repeatedly chose to violate the law.

Brett's understanding of bid-rigging's illegality is revealed by the pains he took to conceal the scheme, such as ensuring that the bids were not rotated in any identifiable sequence, and coordinating the flooring companies' bids to ensure that they were all in a realistic price range. From his annual review of his employer's

ethics policy, Brett knew that his receipt of kickbacks was prohibited—hence his use of a shell company to conceal those payments.

Brett has no excuse for operating these two long-running and highly successful criminal conspiracies. Accordingly, the government's recommended custodial sentence appropriately reflects the seriousness of his offenses and the need to promote respect for the law.

### B. The government's recommended custodial sentence is the best means of deterring future violations.

Because white-collar crimes are generally committed by rational actors, they are "prime candidates for general deterrence." *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (quotation omitted). Under general deterrence principles, "[t]he lower the rate of a [crime]'s detection, the higher the [sentence] required to ensure that crime does not pay." *United States v. Rogan*, 517 F.3d 449, 454 (7th Cir. 2008); *see also Brown*, 880 F.3d at 405–06 (applying this principle). Bid rigging and money laundering are both incredibly difficult crimes to detect because, in each case, the victim may never realize that it was cheated. That is especially true where, as here, the conspirators take pains to disguise their conduct. Given the difficulty of detection, and that Brett received over one hundred thousand dollars through his criminal ventures, a custodial sentence is necessary to demonstrate that bid rigging and money laundering do not pay. By contrast, a non-custodial sentence will signal to potential white-collar defendants that criminal prosecution is a mere cost of doing business.

Beyond general deterrence, there is also a strong need for specific deterrence in this case. Brett remains of working age and is likely to continue to seek employment as a salesman, which may provide him continued opportunities to rig bids, fix prices, and solicit kickbacks.[6] As described above, Brett committed his crimes despite being fully aware that his conduct was wrongful. Because such knowledge was insufficient to deter Brett in the past, it is unlikely to be sufficient in the future. Rather, to ensure that Brett does not abuse any future sales position he obtains, he must receive a punishment adequate to specifically deter him. Imprisonment is the only means available of getting that message across.

### C. The government's recommended custodial sentence is appropriate in light of the history and characteristics of the defendant.

Brett has no way to justify his decision to engage in criminal conduct. He enjoyed an excellent relationship with his parents and was raised in a stable, middle-class home. PSR ¶ 62–63. He attended college, is in good health, and has a supportive marriage. PSR ¶¶ 69, 75–77, 91. During the relevant period, Brett was making $75,000 per year, plus commissions, at Manufacturer A, and he retains a net worth of over $900,000. PSR ¶¶ 96, 100.

Despite all of these advantages, Brett still decided to cheat in order to enrich himself even further. Such naked greed has no justification. Because of the total absence of any mitigating features of the defendant's history or characteristics, imprisonment is an appropriate punishment for his crimes.

---

[6] Indeed, he is presently employed as a salesman. PSR ¶93.

### D. Brett's cooperation justifies a below-Guidelines sentence.

The § 3553(a) factors support a custodial sentence for Brett's brazen and unjustifiable crimes. However, as described above, Brett's significant cooperation with the government's investigation warrants a below-Guidelines sentence. In particular, a forty percent reduction from the low end of Brett's Guidelines range appropriately recognizes Brett's assistance and provides an adequate incentive for future defendants to cooperate in the government's investigations. Accordingly, the Court should sentence Brett to sixteen months of imprisonment.

### E. A $10,000 fine is both necessary and appropriate.

U.S.S.G. § 5E1.2(d) provides numerous factors for the Court to consider in determining Brett's fine. Ultimately, the most important requirement under § 5E1.2(d) is that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." Due to the financial nature of Brett's crimes, a fine is necessary. And when combined with a sentence of sixteen months imprisonment, a $10,000 fine will provide adequate punishment. Thus, a $10,000 fine is both necessary and appropriate.

## VI. NO ORDER OF RESTITUTION

Restitution is not mandatory for Title 15 antitrust violations, so the Court is not required to order the defendant to make restitution to the victims of his bid rigging. *See* 18 U.S.C. § 3663A(c). The Court could order restitution under 18 U.S.C. § 3663(a)(3), which provides that the Court may order restitution to the extent agreed to by the parties in a plea agreement. Consistent with Paragraph 19 of the plea agreement, however, the parties have not agreed to restitution. A civil cause of action

filed in this District potentially provides for a recovery of a multiple of actual damages for the defendant's bid-rigging victims. *See Northbrook Park Dist. v. Mr. David's Flooring Int'l, LLC*, 20-CV-7538 (N.D. Ill.).

Under 18 U.S.C. § 3663A(a)(1), the Court must order the defendant to pay restitution to any victim of the money-laundering offense charged in Count Two of the Information. The parties agree that there is no identifiable victim under 18 U.S.C. § 3663A(a)(2). Accordingly, consistent with Paragraph 19 of the plea agreement, the Government recommends that the Court impose no order of restitution for the defendant's money-laundering offense.

### VII. SUPERVISED RELEASE

Consistent with paragraph 19 of the plea agreement, the government takes no position as to whether a term of supervised release would be appropriate for Brett.

### VIII. CONCLUSION

The government respectfully requests that the Court sentence Brett to sixteen months of imprisonment, a $10,000 fine, no order of restitution, and a $200 special assessment.

Respectfully submitted,

/s/ *Charles D. Fox*
CHARLES D. FOX
charles.fox@usdoj.gov
AMBRIS SARAVANAN
ambris.saravanan@usdoj.gov
CARLA M. STERN
carla.stern@usdoj.gov

                      Trial Attorneys

                      U.S. Department of Justice
                      Antitrust Division
                      209 South LaSalle Street, Suite 600
                      Chicago, Illinois 60604
                      Tel: (312) 984-7200

Dated: March 24, 2023